The first case this afternoon is People of the State of Illinois v. Melvin Coyle and Mr. Peterson. When you're ready, would you please proceed? Thank you, Your Honor. May it please the Court? Counsel? This is an appeal from the second stage dismissal of Mr. Coyle's petition for post-conviction relief. The issue on appeal is whether Mr. Coyle has denied the effective assistance of counsel at the trial proceedings, the remand proceedings, and the post-conviction proceedings in this case. Following the jury trial, Mr. Coyle was convicted of the predatory criminal sexual assault of his wife's 7-month-old granddaughter, H. J. On direct appeal, this Court observed that the defendant was convicted on little more than opportunity to commit the crime. The theory of prosecution was that this opportunity occurred when the defendant and his wife babysat H. J. one evening. A medical exam conducted the next day revealed that H. J. had injuries that were consistent with criminal sexual assault. Medical testimony suggested that the injuries had occurred within the preceding 48 hours. Based on this timeline, the State claimed that Mr. Coyle was the only person who could have committed the crime. The record reveals, however, that H. J. resided in a trailer with her parents and several of her father's relatives, including her father's 14-year-old brother, M. J. after Mr. Coyle was incarcerated. This information was presented to the trial court in a post-trial motion, but Pamela, the child's mother, failed to appear at the hearing because she was divorcing her husband, Christopher, and was afraid for her life. The motion was denied. On appeal, this court noted that the police never investigated the other individuals living in the trailer where H. J. resided. According to court, we demanded for an evidence during hearing, stating that it's crucial to investigate Pamela's claims to ensure that the abuse is not continuing. On remand, Pamela testified that the abuse was continuing, but defense counsel did not call any other witnesses. Defense counsel did not make any argument in support of the motion, and the trial court denied the motion without making any findings available. In his post-conviction petition, Mr. Coyle alleged that he was denied the effective assistance of counsel or his attorneys on trial and on remand, failed to investigate the other individuals who were living in the trailer with H. J., and had contact with her during the crucial 48-hour period in question. This factual allegation, which must be taken as true at this stage of the proceedings, remains unrebutted. Because defense counsel's failure to contact, interview, subpoena, or investigate as witnesses the other individuals who lived in the trailer with H. J. during the critical period in question raises questions of fact unanswered by the record. This cause should be remanded for an evidence during hearing. Now, we are also asking that new counsel be appointed to represent Mr. Coyle on remand, because post-conviction counsel did not investigate these claims either. He filed a 651C certificate certifying that he made the necessary amendments to the petitioner's petition. The record indicates, however, that no amendments were made to the petition. And at the hearing, post-conviction counsel stated, well, there were other witnesses that could have been called to testify at the remand hearing, but post-conviction counsel didn't obtain affidavits from those witnesses or explain why he could not obtain affidavits if that was the case. These witnesses included Hans' uncle M. J., who had a history of physically abusing H. J. and others. His documents and statements in the record indicate that M. J. was characterized as developmentally challenged. He had lived in the trailer with H. J. during the period in question. He attempted to kill H. J. when she was in the womb. He physically abused H. J. He put a rope around H. J.'s neck. He had been sexually abused himself by his stepbrother, and he continued to live in the trailer with H. J. after the defendant was incarcerated. And the sexual abuse of H. J. continued after the defendant was incarcerated. These facts would have contradicted the theory of prosecution that the defendant was the only one with an opportunity to commit the crime. It's especially significant for this court found that Mr. Coyle was convicted on little more than that opportunity. And it's especially significant in light of the fact that the abuse continued after he was incarcerated. For these reasons, I would ask this court to reverse the judgment of the circuit court and remand this cause for further post-conviction proceedings with directions to appoint new counsel to represent Mr. Coyle. Thank you. Ms. McCormick? Your Honors, Mr. Peterson, I am Rebecca McCormick. I'm arguing in place of Mr. Kevin Sweeney, who briefed this case. We focus the court to the stage that this is at. This is the appeal of the dismissal of a post-conviction petition at the second stage. It's subject to de novo review. And so what claims did the defendant make? He made two, basically. The first one was a claim of actual innocence. And he was asserting that DNA evidence could have exonerated him. And in that section, he asserted that someone else could have done this. And then he named certain names of people that he suspected might have done it. Among those are people that were living with the seven-month-old victim and her parents in the same trailer. He specifically named Jacob Jones, Michael Jones, and then others. Those are the only names that he came up with. And those were only mentioned in support of his argument that DNA testing was necessary. The defendant has not raised this first issue about DNA testing on appeal. So any issues pertaining to Michael Jones and Jacob Jones and DNA testing is weighed. Although this was—and so that all falls under his first claim. The second claim was a claim of ineffective assistance of counsel on remand. Pam Jones, who was the mother of the victim, had written a letter and had been— that she had taken to defense counsel after trial stating certain things. And this court—the court below did not grant continuance. And this court remanded it for hearing on that issue. And on remand, Pam Jones explained that her mother and her grandmother and her sister pressured her and forced her into writing this letter and that they told her what to say. And then that later Elizabeth, her sister, drove her to the office and stood there while she delivered the letter. And she said she denied some things in the letter and denied other things. And in her testimony, that's where we get the information about Michael Jones hurting her child. But during her testimony at that hearing as well, she also said that she was always there and Michael Jones could not have been the one who harmed her child. She was present when Michael Jones was present with her child. So the second claim, which was that counsel on remand was ineffective because he did not call anyone to rebut Pam Jones' testimony about being pressured into writing this statement. Also at the hearing, Pam Jones did reaffirm her testimony at trial and did reaffirm her testimony that it was the defendant who harmed her child. But she never testified directly that she saw the defendant do anything. No. The only evidence against the defendant was that he was there. It is circumstantial, yes. And in her testimony- So when you say she reaffirmed her testimony at trial- That the defendant did this- Yes, yes, right, right. I'm sorry. I don't mean to mislead the court. There really wasn't any evidence like that, was there? No. What her testimony was was that she dropped her child off shortly before 5 o'clock and that she had changed the child's diaper just before she went and dropped the child off and the child was found. And that when she picked the child up, the child was put to bed at 10.30 and then sometime in the night the child woke up crying and that's when she discovered the blood. And then in the morning after she changed the diaper there was another bloody diaper and then they took her to the doctor. So the point is that during the time in question when the injuries could have been inflicted, the infant was in the care of her maternal grandmother, Linda, and the defendant. And the allegation in the post-conviction petition is and possibly others. No. No. No. That part is clear. During the time period from 5 o'clock until 10.30- Okay, I thought we were talking about a 48-hour time period is what- Well, you know, the injuries were fresh and the testimony was that- Because this 5 to 9 period nobody saw anything happen. Correct. That's just the time frame that the defendant was there. Yes. And yes, there was a 24 to 48-hour time period that the doctor testified from June 29. The injuries occurred on June 28. And on June 29 at 8 o'clock in the evening that doctor testified that the injuries were fresh and they could have been 24 to 48 hours before. Okay, now let me ask another question. Let me ask another question. Did the defendant call any witnesses on remand? No. It was just Pam Jones who testified. But what cuts off that 48-hour period and makes it shorter is the fact that just before Pam Jones took her daughter to be cared for by the grandmother, she changed her diaper and everything appeared fine. There was no injury. So whether or not this child lived with other pedophiles or whether or not other people had an opportunity to molest her prior to this incident or after this incident, and there is some information that the child was further molested by someone else at a later time and that the mother ultimately gave the child and her sibling up for adoption, that is simply the side point. What we're talking about is the injuries that the child sustained after 5 o'clock when she was dropped off and before 10.30. And the only persons that had access to this child during that time was the defendant, the grandmother, and Elizabeth, the sister, testified that she was there for a while, but the jury did not credit her testimony. There were prior statements of the grandmother that were brought in at trial that contradicted it. So whether or not the child could have been molested by other people, it doesn't have any bearing on this trial. You have to agree, the evidence upon which the defendant was convicted is pretty weak. Yes, it was. It's entirely circumstantial and it has to do with access. And the only circumstantial evidence is he was there. Right. That's it. Well, no, the other circumstantial evidence is that they were, the grandmother in her prior statement said that she was sitting on the couch and that she fell asleep and her husband was sitting on the couch and the baby was asleep in the living room and that her husband, they both fell asleep on the couch and then when she woke up, her husband had moved and she thought that was strange. She didn't know why he had moved. I'm not sure if that's actually circumstantial. It tends to prove another fact, but anyway. Other than, I mean, it shows that he moved. I agree, this is a slim chance. So this guy files a post-conviction petition. He alleges, you know, I can bring in other witnesses here possibly who were not investigated by anybody, which may show that other people had access to this child, one of them a registered sex offender. Why shouldn't we let him do that? Well, this is a second stage dismissal and it goes to the sufficiency of the petition. Substantial showing. Yes, and the petition has nothing but speculation that this could have happened and speculation. There are no affidavits to support this. There's no affidavit of any witness that could have been called that said, I did it or I watched somebody else do it. And there's allegation, isn't there, that his post-conviction petition counsel didn't do a very good job, didn't amend his pro se petition? Well, now we can talk about that too. Why would post-conviction counsel not go ask someone who had lived with the child in the time period which was 2002, the trial was in 2004, the post-conviction petition, I mean the hearing on remand was 2007, and then the post-conviction petition was 2010? It's a long time to go back and try to find people. Well, now we are engaging in speculation. There's nothing in the record, is there, that the counsel said he couldn't find them or went and looked? No, but the presumption that arises when counsel files a Rule 61C certificate is that he made efforts and was unable to find. And there's nothing in the record to rebut that presumption. And some of these people were pretty old, like the mother's grandmother, Nellie. People move on. Linda had moved on to another boyfriend, the grandmother, and there's nothing to say that she'd be willing to testify. Vis-à-vis whether or not Pam's statement was pressured or forced and she was told what to say. That's the narrow issue with Nellie and Linda. Elizabeth, she had her affidavit appended to the post-conviction petition, but her affidavit didn't help so much because it affirmed that, yeah, I was there when she wrote the statement, and, yes, I took her to the lawyer's office, the defense counsel's office. So there's just nothing much to support. Also, you know, back to re-hearing. Sorry, was there any questions? No. Thank you. Rebuttal. The roadmap was set out by this court on direct appeal. Investigate the other people in the trailer who had access to HJ. On remand, defense counsel said, you know, I'm a special public defender. I don't have funds for an investigator. Well, at that point, it's incumbent on him to file a motion for the appointment of an investigator. It remains unrebutted to this day that no investigation was conducted. We need to get defense counsel on the stand, find out what happened. We need an investigation that this court said was crucial many years ago. Are there any questions? Thank you. Thank you. Thank you for your arguments and your briefs, and we will take the matter under advice. Thank you. And the next case is People of the State of Illinois v. Dustin Fields. Mr. Burke, proceed when you're ready. Thank you, Your Honor. Thank you, Mr. Court. I'm Robert Burke with the Office of the State Appellate Defender. I represent Dustin Fields. We're asking the court to reverse outright one of his convictions for count two attempted unlawful restraining. Some facts I want to talk about right off the bat, right here at the start. He did nothing to restrain this woman. She was coming down south, coming down Maple Street. And a Google map is attached to my reply brief. And over in Centralia, she's coming south on Maple Street. To her immediate left is the Centralia Public Library. He's driving on Maple Street on her right. A block away on her right is US 51. I think over there it's called maybe Elm Street or something like that. Route 161 is behind her, less than a block behind her. That's also called Broadway Street, I believe, as it runs east-west through Centralia. He didn't pull up onto the berm. He didn't pull up onto the sidewalk. He didn't use his car in any way to block her. Now, the state's brief has a number of inaccuracies and irrelevancies in the facts. And because of that, I want to actually talk about what he was charged with. Count one was stalking. Now, for stalking, that's a co-ed offense. And for that, you look to what did the complaining witness reasonably believe. Did she reasonably believe that her safety was in danger? That is an objective standard, what is reasonable in these circumstances. Count two, attempted unlawful restraint. Attempt is an in-co-ed offense. And for that, you have to have specific intent. And you don't measure that objectively. You measure that subjectively. What did Mr. Fields have in his mind? So the fact that she was scared goes to count one. The fact that she was frightened goes to count one. None of that goes to count two. For count two, we have to look what was in his mind. Now, in-co-ed offenses are special in our law because it's real easy to say somebody tried to do something. Well, how do you prove that somebody tried to do something? So because that's an allegation that's easy to make, we say if you're going to make that allegation, you have to prove that they had the intent to commit the crime. You can't just toss it out there as a general intent crime. The statute and the jury instructions both specify specific intent. Under general intent, then you can look to what was reasonable in these circumstances. Just as on count one, what was reasonable for this young woman to be feeling that day? Well, that is an objective thing. That's count one. That is not count two. Count two is specific intent, whether he intended to do something. Your Honor, there's nothing in the record that shows that he specifically intended to restrain her that day. Can I ask you this? The state has got in their brief on pages three and four a description of the testimony in the case, and it leads up with the type of comments he was making, the $60 offer, the good time, and then she's crying. And then he says, get into the van. Now, we don't know if he said it loud, harsh, or whatever. Now, isn't that a substantial step or a step to having he wanted her to get in that van? I don't know that he wanted her to get in the van, Your Honor. Well, he said, get in the van. Now, can't I infer from that or can't the jury infer from that that it was his intent to get her into that van? And that would be restraint. If she, for some reason, felt that she's 16, 17 years old, this is going on, he wants her in there, is that enough to prove attempt? The state cites no cases in its brief that says spoken words are a substantial step, unless perhaps conspiracy. And I don't know about that. It's a great question, Your Honor. You think, is it your position, then, that spoken words cannot be a substantial step towards unlawful restraint or any crime, I guess? They perhaps could be solicitation to commit murder, maybe, or something like that. Like I said, I haven't thought about that. Yeah, that went too far. But just in this context. No, I don't believe that in this context that is a substantial step. And that is even if he meant to somehow kidnap her or something like that, he's not restraining her. He's saying, get in the van. Well, what do those spoken words mean? It's not the same like grabbing somebody and pulling them into the van or pulling the van up onto the sidewalk to block her path or anything like that. It's just spoken words. Spoken words can be quite powerful. I mean, depending on who you're directing them to. I mean, we're not talking about a 6-year-old child. We're talking about a 17 at the time. Yes. But go ahead with your argument. Really, that's what contended, and that is the only evidence that the state has. And that's no evidence at all, the fact that he spoke those words to her. I mean, it would be different if she had said, oh, you've overborne my will in getting in the van. He was just driving aside her needs. His subjective intent at this time, you said. Yes. It's his. Yes. And his words clearly seemed to express what he wanted. Yeah, but that doesn't mean that he meant to restrain her. He was telling her, hey, do something of your own volition. He had gone through a lead-up of getting her voluntarily into the van. I'll give you the $60. I'll give you a good time. I'll do all that. And then finally he says, get in the van. Just get in. Now, isn't that maybe he goes from voluntary to not voluntary? I don't believe so, Your Honor. Okay. There was nothing about that that overbore her will. He was making dirty comments. He was talking about her breasts. He was asking for oral sex. Get in the van for a good time. He wasn't trying to kidnap her. He was trying to be a pervert. And I don't believe that he meant to get her into the van. I don't believe that she was in any danger of being taken into the van. And the State has not argued that that phrase. I know. When you look at the charging instrument, the charging instrument doesn't say he took a substantial step in that. He said get into the van. The charging instrument, and we have to look at the charging instrument, the four corners of it, said he drove his van in front of her. He did not drive his van in front of her. He drove his van beside her. So you believe that they're limited to what was in their charging document? And that's what they're briefed. You know, I have to admit this is something I kind of had a question about. Yes. For this, I think you have to look to, for attempt, you have to look to the four corners. Maybe there are other crimes that you could say, well, this or this or this. But here, they had to allege and prove certain things. They allege that he was pulling the van in front. That was a substantial step. They didn't allege that saying get in the van was a substantial step. Could the jury consider his statement, get in the van, as evidence of what his intent was when he pulled the van alongside her? Well, yes. I mean, it's all wrapped up together. Sure. And by the way, it was a bench trial before the Honorable Mr. McCain. But the fact that that could have been considered as where's his mind at, you still, that's the men's race. You still have to prove the actress' race. What was the act he performed to get her into the van? Okay. Or to restraint. Let me ask a follow-up question. Your brief, page four, you quote from page 135 of the record about what the alleged victim or the victim testified to about what happened out on the street. And that's where you had the part about he was driving. Yes. Okay. Now, the state in their brief, also citing page 135, says defendant's van was in between Ms. Castellari and her goal. Ms. Castellari tried to cross the street, but defendant kept driving right next to her, blocking her egress. Ms. Castellari speeded up, and the defendant's van speeded up. Finally, knowing she could not outrun defendant's car, Ms. Castellari fainted forward and then dashed behind defendant's van. Is that just the state's extrapolation, or is there more testimony on 135? That's extrapolation, Your Honor, and that's what I'm talking about. I mean, did the victim ever say, I dashed behind his van to make my escape or anything like that because he kept driving next to me, I couldn't get around? Or do we have everything that she actually said in this quote that you put in your brief? I used quotes. The state did not use quotes. I know. I'm just asking, is that everything she said about it? And the state's really just kind of, you know, giving an interpretation of her testimony. Well, I know that on page 135 there was, and that's just one taken record of what we're both talking about. Yeah, yeah. There was other testimony on that page. The salient part of it was certainly less than half a page. I'm just trying to figure out, did she say that when I tried to speed up, he'd speed up? No, she did not say that. She never said that? No, she said I was walking, he was driving beside me, I started walking fast, and he sped up and stayed beside me. Okay. Did she say, I knew I couldn't outrun his car? I don't recall. You see what I'm getting at? That's what I'm trying to figure out here is, and we'll get an answer here from Ms. Shanahan pretty soon, I'm sure. But is that an interpretation, or is there more to the testimony than what we've got over here? There's not much more to the testimony. Okay. And she says, if I'm to put words in her mouth, I juked left and ran right, and I don't understand it. I mean, she doesn't say he slammed on his brakes and tried to stop me from getting behind the van. I don't know why she would have faked like she was going to run in front of the van. Maybe she thought that he would speed up and try to stop her. I don't know. But what was in her mind is not the relevant. What was in his mind is the relevant. And he did nothing. Once she decided to run behind his van instead of run to the library or run Route 161, he did nothing to stop her. Now, he continued to stalk her after that. That's not one of the issues on appeal. Okay. First, we'll get you on rebuttal here in a few minutes. Thank you, Your Honor. Okay. May I please report? Counsel. My name is Sharon Shanahan, and I represent the people of the state of Illinois. In his reply brief and before this court today, the defendant has spoken a great deal about the state's proof that the defendant intended to block Ms. Castellari's egress. Now, and he says, well, we can't talk about what the victim thought because that's what she thought, not what the defendant thought. But I think we all know that it's… Well, we can't speculate about what she thought, right? I mean, we've got to go on the evidence that she testified to. We know what she testified to. I'm talking about the defendant's intent. The defendant's talking about the defendant's intent. And he's saying, well, you can't look at what she testified about, how she felt, in order to determine his intent. Well, intent is rarely established by anything other than circumstantial evidence. And so what we can do is look at her version of the facts to determine what his intent was. Now, we know that prior to the time we ever got to this point, this man's been following her for six blocks, I believe it was. I mean, I knew at the time I wrote the brief. But she saw him at four different occasions as she progressed on her job. And it was after these repeated sightings that she was extremely unnerved and decided to leave her planned path and get somewhere safe. That goes to the stopping. But the fact of the matter is she left her planned route, and she is on… The defendant is correct. It's on the street that the library is on. And so as you point out, both of you have mentioned the fact that he told her to get in the van. He pulled up next to her, right next to her. I mean, he's right next to her. Is there a testimony record? Does she say he was a foot away, he was two feet away? Is there anything like that? There is testimony about how far away she is. I mean, this is what I'm getting at with what you have in your brief, too, you know, whether or not you're giving an interpretation. Did she say? Do you have any testimony about him being right next to her? I would be glad to tell you I take pretty good notes when I read a record. On page 135, this is the defendant's testimony. The defendant could tell that she was crying. This is the defendant's testimony? This is the victim's testimony. On 134, the van pulled up straight through Mabel, pulled up next to the victim. He asked the victim if she was on the track team. She put her head down, said no, kept walking. Then the defendant said, I'm on 134 now. Then the defendant said, how big are your titties? The victim testified that she was scared, crying. She looked at the defendant. I'm reading my notes. Looked at the defendant. The defendant said, oh, you must be a decoy. The victim tried to get to Travis' house, so she walked faster. The defendant still kept driving right next to her while she was walking. Now I'm on 134, 135. The defendant could tell she was crying and upset. Page 135, the defendant said $60 to show me a good time in the van. The victim says no. She's still crying. The victim then told her to get into the van. The victim had to cross the street because she was on the outside of the street from Travis' house. She started walking very fast. The defendant's driving. The victim's trying to cross the street. The defendant keeps driving right next to her, so she acts like she was going to go in front of him, and then she ran behind him. The victim was trying to get in front of the vehicle to cross the street, but she couldn't get in front because the defendant speeded up, so she ran behind him, and she ran to Travis' house. You're reading from your notes, okay. I'm reading from my notes of what is on pages 134 and 135, and I think that last part where she said that she was trying to get in front of the vehicle to cross the street, but she couldn't get in front of him because the defendant speeded up, so she ran behind him. That I think is... What she actually says, all she says, and we've got the quote here, there's a question, but could you get in front of him when you tried to speed up? She said no because he was driving, so that's when I ran behind him. He was driving. We know he was driving the car. But the issue is, isn't it, what did he do to drive the car that restrained her? And is there anything in her testimony that really... At least what we have here, there's nothing that says he sped up and she sped up and all this stuff. It does say that she sped up, he sped up. It does say that. She testified to that. Yes, she did. Okay. And he's already made these rather unnerving comments to make to a young girl like that, and I think when you take what he said to her, where I think the fact finder can most definitely infer intent to what he's saying. Now, let's back up just a minute here and what would have been the first thing I said of the definition of unlawful restraint. It is the detention of a person by some contact which prevents her from moving from one place to another. Now, if that means moving from the east side of the street to the west side of the street, that's unlawful restraint. Furthermore, obviously it has to be willful and against the victim's consent. This was most definitely against the victim's consent. Actual or physical force is not a necessary element of unlawful restraint as long as the individual's freedom of locomotion is impaired. Now, I cited a Fourth District case of People v. Warner for that statement of law, but you can find that in lots and lots and lots of cases that deal with unlawful restraint. Freedom of locomotion is impaired. He did not have to drive up onto the grass berm. He did not have to cut her off. And I forgot the last thing, the duration of the restraint, even if it's just a few seconds, that's good enough. A few seconds in which her freedom of locomotion is impaired is enough. She's on the street. She turned down this street so she could get to safety. She wanted to get to the other side of the street because that's where she could get to her friend's house where she was safe. She says she speeded up. The defendant speeded up. She's been walking next to him now for quite some time because he's talking to her. He can't be far away from her. If he's talking to her, if he's looking at her breast size, if he's making all this comments to her, if he can see she's crying, he's not very far away from her. She speeds up. He speeds up. If you stop right then and there, that's unlawful restraint. Well, you're convicting, I guess, good to convict him of unlawful restraint. He's charged with attempted. I think he absolutely could have been convicted of it. I think he did. I think he completed the crime. Was he charged with that? Originally, was he charged with unlawful restraint and was instructed on attempted? I think he was originally, now I'm drawing on memory. That's okay. I think he was originally in charge with, no, he was originally in charge with attempted. Well, since we're just looking at attempted, you're arguing all of these are the substantial step, the driving and the what? Well, certainly an attempt crime is a lesser included offense of the actual crime. So if he actually did all of the things that establish unlawful restraint, then certainly he's also guilty of attempted. But the charge was attempted. And I thought when I read this, why did you charge him just with attempted? He completed the crime. He restrained her. To say she's not restrained is to say, I'm sorry, I'm a doctor. We're going to analyze it from the standpoint of what he was convicted of. Yes. Okay. But as I say, if you're convicted of the greater crime, then you're certainly convicted of the lesser. To say that he's not restrained is to say that a sheepdog doesn't restrain sheep because he's not biting. He's just carrying back and forth to prevent them from running away. If he's right next to her, she doesn't like it, she speeds up, he speeds up, she doesn't like it, she can't outrun a car. So all she can do is make him pretend like he's going to take off running, and then she faints behind him. And those moments when he prevented her from crossing to the other side of the street, be they a few seconds or longer, it's immaterial. She wanted to cross to the side of the street. She moved up across to the side of the street. He prevented that. He actually completed unlawful restraint, so certainly there is sufficient evidence to convict him of attempt. What was the disposition on the sentences on both? Do you have that? That's okay. It'll be in the record. I can look it up. I do know, since you just asked that, I'm looking at this judge saying this case wasn't even close. Okay, that's okay. Rebuttal? Again, most of that argument was about her mental state, about how extremely unnerved she was. Well, she was so extremely unnerved, let's give him five years in prison. That's the sentence he received for stalking. He's serving a five-year sentence for extremely unnerving her. I don't think we should punish him again for extremely unnerving her when he's serving five years. What was the sentence on the attempt at unlawful restraint? That was a Class A misdemeanor. Right. Did it run concurrent? Yes. Okay. Go ahead. So if we're going to focus on extremely unnerved, he's being punished for that. I don't think he should be punished for this attempt crime. There was some confusion that day after he got arrested down at the jail about what to charge him with, and the prosecutor got involved, and ultimately these were the two charges. I don't think they were amended, but I might be wrong, Your Honor. Now, there was talk about her freedom was impaired. Well, the thing that the state does not want to talk about because they have nothing is what was his mens rea? What was his mental state? It has to be specific intent in order to prove guilt, and the state refuses to talk about that. All they want to talk about is how extremely unnerved she was. Well, he served five years for how extremely unnerved she was. Now, the state also says that an attempt is a lesser-included offense of the co-aid offense. It is not a lesser-included offense. It has a different mental state. A different mental state is not going to make it. It has a higher mental state. That's not going to make it a lesser-included offense. It's only lesser to the extent that the punishment is lesser. Now, I want to get back to page 135 in the record. This is most bothersome to me. It's just Justice Stewart was reading, I believe, just after that. Defendant did not want Ms. Castellari to leave, so he placed his van right next to her, pacing her as she slowed down and speeded up. That is not on page 135. That is nowhere in the record. That is made up of whole cloth. It verges on fraud on a court. It just so happens that it's the only way to misconstrue the evidence in this case favorably to the state so that they can keep this conviction. She never says, I slowed down and he slowed down. She never said, I slowed down. She said, I was walking, and I speeded up. I was walking faster, and he stayed beside her. Are there any questions, Your Honor? No, thank you. Thank you, Your Honor. Well, we would like to thank both of you for your arguments today and your briefs, and we will get to a decision at the earliest possible date. And that was the last case on the docket for this afternoon other than no, that was actually the last case. Okay, well, thanks for everybody coming in this afternoon. All rise.